# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

DEBORAH OMOKEHINDE,

      Plaintiff,

                                  Case No. 06-15241

v.                                   Hon. Gerald E. Rosen

DETROIT BOARD OF EDUCATION
and JENNIFER JOUBERT,

      Defendants.

_____/

## OPINION AND ORDER GRANTING IN PART
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on     June 12, 2008    

PRESENT:  Honorable Gerald E. Rosen
                    United States District Judge

## I. INTRODUCTION

On October 6, 2006, Plaintiff Deborah Omokehinde commenced this suit in

Wayne County Circuit Court against her former employer, Defendant Detroit Board of

Education, and her former supervisor, Defendant Jennifer Joubert, alleging that

Defendants unlawfully retaliated against and discharged her for exercising her right of

free speech as protected under the First Amendment to the U.S. Constitution, and also

advancing a number of claims under Michigan law. Defendants removed the case to this

Court on November 27, 2006, citing Plaintiff's assertion of a claim arising under federal

law. *See* 28 U.S.C. §§ 1441(a), 1331.

By motion filed on October 29, 2007, Defendant Detroit Board of Education (the "School District") now seeks summary judgment in its favor on Plaintiff's federal and state-law claims.[1]  With regard to Plaintiff's sole federal claim of First Amendment retaliation, the School District principally contends that Plaintiff was not speaking as a "citizen" within the meaning of the Supreme Court's recent decision in *Garcetti v. Ceballos,* 547 U.S. 410, 126 S. Ct. 1951 (2006).  In response, Plaintiff cites her deposition testimony that she spoke out as a "tax-paying citizen," and she further asserts that the subject about which she spoke — the alleged misuse of federal funds by her supervisor, Defendant Joubert — is clearly a matter of "public concern" that enjoys First Amendment protection.

The School District's motion has been fully briefed by the parties.  Having reviewed the parties' briefs in support of and opposition to this motion, the accompanying exhibits, and the record as a whole, the Court finds that the relevant facts, allegations, and legal arguments are adequately presented in these written materials, and that oral argument would not aid the decisional process.  Accordingly, the Court will decide the School District's motion "on the briefs."  *See* Local Rule 7.1(e)(2), U.S. District Court, Eastern District of Michigan.  For the reasons stated below, the Court finds that Defendants are entitled to summary judgment in their favor on Plaintiff's claim of First Amendment retaliation.  In light of this disposition of Plaintiff's sole federal claim, the

---

[1]Defendant Joubert has not filed a separate summary judgment motion, but instead has joined in the School District's motion.

Court declines to reach the School District's various challenges to Plaintiff's claims under Michigan law.

## II. <u>FACTUAL BACKGROUND</u>[2]

In April of 2001, Plaintiff was hired by the Defendant School District as a Parent Community Advocate/Parent Community Liaison. Beginning in 2003, Defendant Jennifer Joubert was Plaintiff's supervisor. As a parent liaison, Plaintiff was responsible for organizing parent organizations at the schools to which she was assigned, working with parents to increase their involvement in their children's education, and soliciting community and business support for the schools.

In performing these job functions, Plaintiff became familiar with the federal regulations governing the use of so-called "Title I" funds for parental involvement activities,[3] and she attended seminars and received training on the appropriate use of these federal funds. (*See* Plaintiff's Response, Ex. C, Plaintiff's Dep. at 44-45.) Upon completing this training, Plaintiff assumed the task of entering vendor invoices into the School District's accounting system as part of the process of paying these vendors. (*See id.* at 80-81.) At her deposition, Plaintiff agreed that one of her job responsibilities was to ensure that the School District's Title I parental involvement funds were being properly

---

[2]Because the Court elects to address only Plaintiff's federal claim of First Amendment retaliation, the following account focuses solely upon the portions of the record bearing upon this claim.

[3]The Defendant School District receives federal funding under Title I of the Elementary and Secondary Education Act of 1965, which was reauthorized and amended by the No Child Left Behind Act of 2001.

used.  (*See id.* at 45; *see also* Complaint at ¶ 14 ("In or around November, 2003, Plaintiff was assigned responsibility for assisting Defendant Joubert with the Title I budget, including duties related to the expenditure and disbursement of Title I 'parental involvement' funds."); Complaint at ¶¶ 37-38 (alleging that "[d]uring the course of her employment with Defendants, Plaintiff Omokehinde refused to acquiesce in violations of law," but instead "attempted to comply with Title I").)

In the course of these duties, Plaintiff became aware of apparent misuses of Title I parental involvement funds by School District officials.  In particular, she questioned Defendant Joubert's decision to use these funds to pay an outside vendor, American Counselors, Consultants and Distributors ("ACCD"), to distribute flyers, when one of the School District's internal offices was performing similar work.  In Plaintiff's view, this was not a permissible "capacity building" use of Title I funds, and she also questioned the School District's ability to confirm that ACCD and one of its principal employees, Larry Nelson, were actually performing the work for which they were being paid.  (*See* Plaintiff's Dep. at 205-10.)

Plaintiff first voiced these concerns to her supervisor, Defendant Joubert, during a meeting in Joubert's office in approximately January or February of 2004, opining that the School District could face penalties or the loss of Title I funding if its expenditures were found to be improper.  (*See id.* at 210-12.)  Plaintiff testified that Joubert "shrugged off" these concerns and directed Plaintiff to continue entering Larry Nelson's invoices into the School District's accounting system for payment.  (*Id.* at 211-12.)  Plaintiff again

challenged this use of Title I funds a short time later, questioning "how [it would] look" if the matter were exposed in the local media, but Joubert again dismissed these concerns. (*Id.* at 213-14.)  Similarly, when Plaintiff voiced these same objections in an April 30, 2004 conference call regarding the Title I budget, Joubert "became verbally combative and abusive," (Complaint at ¶ 21), telling Plaintiff that "I know you're older than me, but I know what I'm doing," and instructing her to "just do what I told you to do," (Plaintiff's Dep. at 75, 77).

In Plaintiff's view, her questions about the improper use of Title I funds resulted in a deteriorating relationship with Defendant Joubert.  Plaintiff alleges that "[i]mmediately following her complaints," Joubert "began ridiculing her in front of her colleagues, questioning her loyalty, and creating a hostile work environment for Plaintiff." (Complaint at ¶ 19.)  Plaintiff also cites the testimony of a co-worker, Terri Mial, who observed Plaintiff and Joubert "bickering back and forth" about the issue of Title I spending, and who noted that Joubert began to question Plaintiff's loyalty to her.  (*See* Plaintiff's Response, Ex. I, Mial Dep. at 62-63.)

At some point in May of 2004, Plaintiff ceased to perform the task of entering vendor invoices into the School District's accounting system for payment from Title I funds.  Plaintiff states in an affidavit that she discontinued this job duty out of "concern[] that Joubert's directives and practices violated Title I."  (Plaintiff's Response, Ex. K, Plaintiff's 11/21/2007 Aff. at ¶ 3.)

Shortly thereafter, Plaintiff took a medical leave of absence, returning to work in

September of 2004. Her relationship with Joubert did not improve upon her return from leave, but instead continued to deteriorate. Plaintiff testified that Joubert changed her job responsibilities, transferred her out of the schools where she had been working prior to her leave, and made disparaging remarks about her medical condition.

A few months later, in January of 2005, Plaintiff sent an anonymous letter to a Detroit Free Press reporter, Chastity Pratt, detailing her concerns about the School District's Title I expenditures and its vendor contracts.[4] This led to a March 11, 2005 Free Press article in which Ms. Pratt exposed the School District's substantial payments to an "ex-convict," Larry Nelson, to "create what some say was a failed program to boost parent involvement," as well as the District's hiring of Joubert's brother to design the flyers distributed by Nelson's firm. (Plaintiff's Response, Ex. M, 3/11/2005 Detroit Free Press article.) Plaintiff testified that Joubert was aware of her relationship with Ms. Pratt, and she opines in her response to Defendant's motion that it would have been "obvious" to Joubert that she was the source of the information revealed in Ms. Pratt's article.

On or around May 23, 2005, Joubert informed Plaintiff that she was being discharged, with the School District citing "economic necessity" as the basis for this action. (Plaintiff's Response, Ex. O, 5/20/2005 Termination Letter.) This suit followed in October of 2006, with Plaintiff's sole federal claim resting on allegations that the School District unlawfully discriminated against and discharged her as a result of her

---

[4]Plaintiff was unable to produce a copy of this letter during discovery, testifying that it was lost in a "computer malfunction" and could not be retrieved. (Plaintiff's Dep. at 97-98.)

exercise of her First Amendment right of free speech.  Plaintiff also has asserted state-law claims of wrongful discharge in violation of public policy, disability discrimination, age discrimination, and retaliation.

### III.  ANALYSIS

**A.     The Standards Governing Defendant's Motion**

Through the present motion, the Defendant School District seeks an award of summary judgment in its favor on Plaintiff's federal First Amendment retaliation claim, as well as each of her several state-law claims.  Under the pertinent Federal Rule, summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

As the Supreme Court has explained, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).  In conducting this inquiry, the Court must view the evidence in a light most favorable to the nonmoving party.  *Pack v. Damon Corp.,* 434 F.3d 810, 813 (6th Cir. 2006).  Yet, the nonmoving party "may not rely merely on allegations or denials in its own pleading," but "must — by affidavits or as otherwise provided in [Rule 56] — set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  Moreover, "the mere

existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment." *Pack,* 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted). The Court will apply these standards in resolving the Defendant School District's motion.

**B.**  **Plaintiff Has Failed as a Matter of Law to Establish that She Was Speaking as a Citizen When She Challenged the School District's Use of Title I Funds and Selection of Vendors.**

In Count II of her complaint, Plaintiff asserts that the Defendant School District and her former supervisor, Defendant Jennifer Joubert, unlawfully retaliated against her for exercising her right of free speech as protected by the First Amendment to the U.S. Constitution. In seeking summary judgment in its favor on this claim, the School District argues that Plaintiff was not speaking as a citizen when she challenged Defendants' use of federal Title I funds and their selection of outside vendors, as required to sustain a First Amendment retaliation claim in the wake of the Supreme Court's ruling in *Garcetti v. Ceballos,* 547 U.S. 410, 126 S. Ct. 1951 (2006). The Court agrees.

"[A] State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers,* 461 U.S. 138, 142, 103 S. Ct. 1684, 1687 (1983). Yet, "[i]n order for a government employee's speech to warrant First Amendment protection, the Supreme Court's . . . decisions have long imposed the threshold requirements that the employee (1) must have spoken 'as a citizen,' and (2) must have 'address[ed] matters of public concern.'" *Weisbarth v. Geauga Park District,* 499 F.3d 538, 542 (6th Cir. 2007)

8

(citation omitted). As the Sixth Circuit observed in *Weisbarth,* 499 F.3d at 542, the Supreme Court "clarified the first of these requirements" in its ruling in *Garcetti.* Accordingly, a review of this decision is in order.

The plaintiff in *Garcetti,* Richard Ceballos, was employed as a deputy district attorney for Los Angeles County, California. Ceballos "exercised certain supervisory responsibilities over other lawyers" in the district attorney's office, and was asked in this capacity to review an affidavit in support of a search warrant for purported inaccuracies. *Garcetti,* 547 U.S. at 413-14, 126 S. Ct. at 1955. Upon determining that it was inaccurate, Ceballos spoke to the affiant but did not receive a satisfactory explanation. He then relayed his concerns to his supervisors through a "disposition memorandum" and at a "heated" meeting attended by Ceballos, his supervisors, the affiant, and other sheriff's department employees, at which a police lieutenant "sharply criticiz[ed] Ceballos for his handling of the case." 547 U.S. at 414, 126 S. Ct. at 1955-56. Despite Ceballos's concerns, his supervisor elected to proceed with the prosecution, and the state trial court rejected a challenge to the warrant despite Ceballos's testimony on behalf of the defense.

Ceballos alleged that "in the aftermath of these events he was subjected to a series of retaliatory employment actions," including reassignment to a different position, transfer to another location, and denial of a promotion. 547 U.S. at 415, 126 S. Ct. at 1956. When administrative remedies proved unavailing, he brought suit in federal district court, asserting that his employer had unlawfully retaliated against him for exercising his First Amendment rights. The district court granted summary judgment in the defendants'

favor, reasoning that Ceballos was not entitled to First Amendment protection for speech made "pursuant to his employment duties." 547 U.S. at 415, 126 S. Ct. at 1956. The Ninth Circuit reversed, holding that Ceballos's speech regarding "governmental misconduct" was "inherently a matter of public concern." 547 U.S. at 416, 126 S. Ct. at 1956 (internal quotation marks and citation omitted). In so ruling, the appellate court did not "consider whether the speech was made in Ceballos' capacity as a citizen," but instead "relied on Circuit precedent rejecting the idea that a public employee's speech is deprived of First Amendment protection whenever those views are expressed, to government workers or others, pursuant to an employment responsibility." 547 U.S. at 416, 126 S. Ct. at 1956 (internal quotation marks and citations omitted).

The Supreme Court reversed, agreeing with the district court that Ceballos was not speaking as a citizen. In so ruling, the Court first emphasized that it was "not dispositive" that "Ceballos expressed his views inside his office, rather than publicly," because "[e]mployees in some cases may receive First Amendment protection for expressions made at work." 547 U.S. at 420, 126 S. Ct. at 1959. The Court further found it "nondispositive" that Ceballos's speech "concerned the subject matter of [his] employment," noting that "[t]he First Amendment protects some expressions related to the speaker's job." 547 U.S. at 421, 126 S. Ct. at 1959. The Court then stated:

> The controlling factor in Ceballos' case is that his expressions were made pursuant to his duties as a calendar deputy. That consideration — the fact that Ceballos spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case — distinguishes Ceballos' case from those in which the First Amendment

provides protection against discipline. We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.

Ceballos wrote his disposition memo because that is part of what he, as a calendar deputy, was employed to do. It is immaterial whether he experienced some personal gratification from writing the memo; his First Amendment rights do not depend on his job satisfaction. The significant point is that the memo was written pursuant to Ceballos' official duties. Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created.

547 U.S. at 421-22, 126 S. Ct. at 1959-60 (citations omitted).

Under *Garcetti,* then, Plaintiff's claim of First Amendment retaliation in this case may go forward only if she was speaking as a citizen, rather than pursuant to her duties as a parent liaison, when she challenged the Defendant School District's use of Title I funds and its selection of outside vendors as recipients of these funds. "If the answer is no" — *i.e.,* if Plaintiff did not speak "as a citizen on a matter of public concern" — then she "has no First Amendment cause of action based on . . . her employer's reaction to the speech." *Garcetti,* 547 U.S. at 418, 126 S. Ct. at 1958. This question, as part of the larger inquiry whether Plaintiff's speech is entitled to First Amendment protection, is an issue of law for the Court to decide. *See Nair v. Oakland County Community Mental Health Authority,* 443 F.3d 469, 478 (6th Cir. 2006); *Jennings v. County of Washtenaw,* 475 F. Supp.2d 692, 702 (E.D. Mich. 2007).

To the extent that Plaintiff's claim of First Amendment protection rests upon her statements and complaints to her supervisor, Defendant Joubert, about questionable expenditures of Title I funds, the Court readily concludes as a matter of law that Plaintiff spoke in these instances pursuant to her duties as a parent liaison. Plaintiff testified at her deposition that she attended seminars and received training on the appropriate use of these federal funds. (*See* Plaintiff's Response, Ex. C, Plaintiff's Dep. at 44-45.) Having been trained on this subject, she affirmed that one of her job responsibilities was to ensure that the School District's Title I parental involvement funds were being properly used. (*See id.* at 45.) As she explained at her deposition, "[i]f I was required to enter the [vendor] invoices" into the School District's accounting system, thereby triggering payment of these invoices, "then I wanted to be able to assure Ms. Joubert that the [vendor's] work had actually been completed," and she thus understood that this oversight function was "part of" her job responsibilities. (*Id.* at 208-09.) Similarly, Plaintiff affirmatively alleges in her complaint that she was "assigned responsibility for assisting Defendant Joubert with the Title I budget, including duties related to the expenditure and disbursement of Title I 'parental involvement' funds," and that "[d]uring the course of her employment," she "attempted to comply with Title I" and "raised internal objections to Defendants' violation of this statute." (Complaint at ¶¶ 14, 37-38.)[5]

---

[5]It is worth noting that Plaintiff's testimony and allegations on this point comport with the pertinent regulations promulgated by the Department of Education, which require recipients of federal funds such as the Defendant School District to "comply with applicable statutes [and] regulations" and to "use Federal funds in accordance with those statutes [and] regulations," 34 C.F.R. § 75.700, as well as to "monitor grant and subgrant supported activities to assure

12

Under this record, it is clear that Plaintiff's internal complaints about irregularities in the School District's Title I expenditures flowed directly from, and were part and parcel of, her duties and responsibilities as a School District employee. Plainly, there would have been no reason to train Plaintiff in the appropriate use of Title I funds if she were not expected to apply this training in the performance of her job. Indeed, Plaintiff testified that, beyond this training, she elicited additional information from a U.S. Department of Education official, David Jackson, regarding the subject of "allowable expenses for the Title I parental involvement [budget] that Jennifer Joubert was in charge of," and she relayed her concern to Mr. Jackson in this same conversation that Larry Nelson was receiving Title I funds "based solely on his distribution of flyers." (Plaintiff's Dep. at 88-89.) Nothing in this testimony, or elsewhere in the record, suggests that Plaintiff perceived herself as acting outside the scope of her job responsibilities by exploring the subject of allowable Title I expenditures and raising concerns about Defendant Joubert's use of these funds. To the contrary, and as noted earlier, Plaintiff has both alleged and testified that her job responsibilities encompassed these matters of Title I compliance. (*See* Complaint at ¶¶ 14-18, 37-38; Plaintiff's Dep. at 45.) It follows that Plaintiff did not speak as a citizen when she voiced internal complaints and concerns about the School District's Title I expenditures. *See Winder v. Erste,* 511 F. Supp.2d 160, 173 (D.D.C. 2007) (noting that in the wake of *Garcetti,* the courts "have uniformly held that an employee's communications to his superiors on the precise subject matter of his

compliance with applicable Federal requirements," 34 C.F.R. § 80.40(a).

employment is unprotected by the First Amendment").

In an effort to avoid this result, Plaintiff first seeks to raise an issue of fact by pointing to her deposition testimony that she spoke as a "tax-paying citizen" in raising concerns about the School District's Title I spending. (Plaintiff's Dep. at 121-22.) As noted, however, the question whether Plaintiff was speaking "as a citizen" is one of law for the Court to decide. Plaintiff's self-serving and conclusory assertion on this issue reserved for the Court cannot overcome the evidence in the record — including, most significantly, Plaintiff's own deposition testimony — regarding the nature and scope of Plaintiff's duties and responsibilities as a School District employee. It is this evidence, and not Plaintiff's characterization, that determines whether Plaintiff spoke as a citizen in her internal challenges to the School District's Title I expenditures.

Plaintiff next asserts that "it would be difficult to find a more obvious 'public concern' than presented in this case," (Plaintiff's Response Br. at 25), where she spoke out against alleged misuse of federal funds. Yet, as the Sixth Circuit recently explained, the requirements that a plaintiff must have spoken "as a citizen" and must have addressed matters of "public concern" are ***separate elements*** of a showing that a government employee's speech warrants First Amendment protection. *Weisbarth, supra,* 499 F.3d at 542. Thus, "even employee speech addressing a matter of public concern is not protected if made pursuant to the employee's official duties." *Weisbarth,* 499 F.3d at 545. Absent a sufficient evidentiary basis to conclude that Plaintiff spoke as a citizen in her internal challenges to the School District's Title I expenditures, there is no need to decide whether

the subjects about which she spoke were matters of public concern. 499 F.3d at 546.

This serves to distinguish this case from the one relied upon by Plaintiff, *Joyner v. Cincinnati Public Schools,* No. 06-00803, 2007 WL 1989606 (S.D. Ohio July 6, 2007). In that case, the district court denied a motion to dismiss on the ground that the plaintiff's "alleged speaking out about the alleged misuse of federal funds involve[d] a matter of public concern." *Joyner,* 2007 WL 1989606, at *3. In so ruling, however, the court did not separately address the requirement under *Garcetti* and *Weisbarth* that the plaintiff must have spoken as a citizen. Rather, the court simply noted that "the definition of the scope of an employee's employee's duties w[ill] often present a factual inquiry," *Joyner,* 2007 WL 1989606, at *2, and apparently concluded, albeit without discussion, that this question could not be resolved on the pleadings alone. Here, in contrast, the legal determination whether Plaintiff spoke as a citizen can be — and now has been — made upon a complete factual record developed in discovery.

Finally, Plaintiff seeks to draw a distinction between her initial, internal protests to Defendant Joubert about the School District's Title I expenditures and the anonymous letter she later sent to a newspaper reporter. Plaintiff asserts that the duties of her job surely did not encompass such communications with an outside reporter — to the contrary, she states in an affidavit that Joubert instructed her staff ***not*** to speak to the media. Plaintiff also points to the fact that she sent her anonymous letter several months after she had ceased to perform the task of entering vendor invoices into the School District's accounting system for payment from Title I funds, based on her concern that

these invoices did not reflect allowable Title I expenses.  It follows, in her view, that her letter to the newspaper qualifies as speech "as a citizen" on a matter that was no longer a part of her job responsibilities.

Under the particular circumstances of this case, the Court finds that Plaintiff's anonymous letter to a newspaper reporter stands on the same legal footing as her prior, internal complaints to her supervisor — namely, that neither constitutes speech "as a citizen" that qualifies for First Amendment protection.  First and foremost, it bears emphasis that subject matter of Plaintiff's internal and external communications was precisely the same.  While her anonymous letter is not in the record,[6] Plaintiff does not contend that it differed in substance from her internal complaints to Defendant Joubert. Rather, she has characterized this external communication, like her internal ones, as "detailing her concerns about the legality of the [School District's] vendor contracts and Title I expenditures."  (Plaintiff's Response Br. at 10.)

The Supreme Court has emphasized that "[e]mployees in some cases may receive First Amendment protection for expressions made at work," and that it is "not dispositive" that an employee might have "expressed his views inside his office, rather than publicly."  *Garcetti,* 547 U.S. at 420, 126 S. Ct. at 1959.  Yet, if internal communications do not invariably lie ***outside*** the protective scope of the First Amendment, it surely follows that external communications are not automatically ***entitled***

_____

[6]As noted earlier, Plaintiff testified that her copy of this letter was lost due to a computer malfunction.  In addition, the School District was unsuccessful in its effort during discovery to obtain a copy of this letter from the Detroit Free Press.

to such protection. The Sixth Circuit recognized this point in holding that an employee's speech to a third-party consultant was not protected, explaining that "[t]he reasoning of *Garcetti* . . . makes clear that the determinative factor . . . [i]s not where the person to whom the employee communicated fit within the employer's chain of command, but rather whether the employee communicated pursuant to his or her official duties." *Weisbarth,* 499 F.3d at 545. Accordingly, it is not enough for Plaintiff merely to identify a communication that traveled outside her chain of command; even in this instance, "the content of an employee's speech . . . will inform the threshold inquiry of whether the speech was, in fact, made pursuant to the employee's official duties." *Weisbarth,* 499 F.3d at 545.

Under similar circumstances, two other courts have held that an employee did not attain First Amendment protection by disseminating an initial, internal complaint to an outside party. In *Casey v. West Las Vegas Independent School District,* 473 F.3d 1323 (10th Cir. 2007), the plaintiff school superintendent, Barbara Casey, discovered apparent deficiencies in the defendant school district's administration of the federal Head Start program. Casey initially raised these concerns with several school district and school board officials, but was "told variously not to worry about it, to leave it alone, or not to go there." *Casey,* 473 F.3d at 1326. Casey then registered these same complaints with the federal authorities, and she alleged that she was demoted and terminated in retaliation for these and other instances of speaking out against the defendant school district's practices.

The Tenth Circuit found that Casey was speaking pursuant to her official duties,

and not as a citizen, in both her internal communications and her reports to the federal authorities about alleged improprieties in the defendant school district's Head Start program.  *See Casey,* 473 F.3d at 1329-32.  In so ruling, the court acknowledged that in contacting the federal authorities, Casey was no longer acting pursuant to her duty to "advis[e] her employer on the lawful and proper way to conduct school business," but instead "went very much around" her employer in her external reports of wrongdoing. 473 F.3d at 1329 (internal quotation marks omitted).  Nonetheless, as the "person primarily responsible for the sound administration of the District's Head Start program," Casey had a duty to "act[] pursuant to, or in compliance with, [the] federal regulations" governing this program.  473 F.3d at 1330.  Thus, "[w]hile Ms. Casey disregarded her superiors' direction to suppress her findings about the Head Start program, her decision to report the District's non-compliance to federal authorities was nonetheless in accordance with . . . her job as the senior official responsible for the sound administration of the federally funded program she administered."  473 F.3d at 1331-32.

Although the plaintiff in *Casey* was a high-level school official with primary responsibility for the program that was the subject of her external report of wrongdoing, and although the report in that case was made to federal authorities rather than the media, another court reached the same result under facts that more closely resemble those presented here.  In *Andrew v. Clark,* 472 F. Supp.2d 659 (D. Md. 2007), plaintiff Michael Andrew was a Baltimore police officer who was involved in an incident in which his fellow officers shot and killed an elderly man who had barricaded himself inside his

apartment. Afterward, Andrew prepared an "internal memorandum" raising "serious concerns" about the Baltimore police department's handling of the incident. *Andrew,* 472 F. Supp.2d at 660. When he submitted his report up the "chain of command" and received no response, Andrew provided a copy of his memo to a local newspaper reporter, resulting in an article that raised questions about the tactics used by the officers at the scene of the shooting. 472 F. Supp.2d at 660. Following the publication of this article, Andrew was subjected to an internal affairs investigation and then terminated, allegedly in retaliation for providing a copy of his internal memo to the media.

The district court held that Andrew's preparation of an internal memo and dissemination of this memo to a newspaper reporter were not entitled to First Amendment protection, but instead constituted speech pursuant to the officer's official duties. As a threshold matter, the court had little trouble in concluding that Andrew's submission of his memo through the chain of command did not qualify for First Amendment protection. 472 F. Supp.2d at 661-62. The court then turned to Andrew's claim "that when he elected to 'go public' by handing a copy of his 'internal memorandum' to a representative of the media, he converted what is undeniably speech effected pursuant to his employment duties into 'citizen speech' on a 'matter of public concern.'" 472 F. Supp.2d at 662. Citing *Casey,* the court held that Andrew's internal memo "never lost its character as speech pursuant to his official duties simply by virtue of the wider dissemination he elected to give it after his recommendations were ignored by the police commissioner." 472 F. Supp.2d at 662-63 n.4. Neither could this memo be characterized

as akin to a private citizen's "letter to the editor," where "the very means by which it was prepared and the very subject matter it concerned, coupled with [Andrew's] overt involvement in the incident in question," made it clear that Andrew spoke within "the purview of [his] 'official responsibilities.'"  472 F. Supp.2d at 663; *see also Nixon v. City of Houston,* 511 F.3d 494, 499 (5th Cir. 2007) (acknowledging that the plaintiff police officer's statements to the media, if "considered in isolation," would "more closely approximate citizen speech," but finding that these communications were more properly viewed as a "continuation" of the officer's prior statements that were "made in his role as an employee").

The Court finds this reasoning fully applicable here.  As explained earlier, Plaintiff's complaints to her supervisor about questionable Title I expenditures flowed directly from her duties and responsibilities as an employee of the Defendant School District.  When her protests through the chain of command proved unavailing, she repeated precisely the same complaints to an outside audience.  This Court fails to see how the broader dissemination of precisely the same speech alters the fundamental nature of the underlying communication, such that what was once a part of the employee's official duties becomes the speech of a private citizen.  Rather, in either case, the employee's communication "owes its existence to [his or her] professional responsibilities."  *Garcetti,* 547 U.S. at 421, 126 S. Ct. at 1960.  Such is the case here, where the subject matter of Plaintiff's speech, whether to her supervisor or to a newspaper reporter, concerned a task that she was specifically directed to perform as part

of her job — namely, the payment of vendor invoices from Title I funds, in accordance with the training she had been given in the proper expenditure of such funds.

Indeed, to hold otherwise would place an internal protest against government misfeasance at a disadvantage in comparison to an external complaint, even if the subject matter of the two communications is wholly identical.  In the latter case, the employee could point to his or her election to bypass the chain of command as indicative that the speech in question was made as a citizen, rather than pursuant to an official duty. Notably, in the decision under review in *Garcetti,* the Ninth Circuit cited precisely this concern with the rule ultimately adopted by the Supreme Court, opining that it would "deprive public employees of constitutional protection" when they "report official misconduct up the chain of command," while "affording them protection if they bypass their supervisors and take their tales, for profit or otherwise, directly to a scandal sheet or to an internet political smut purveyor."  *Ceballos v. Garcetti,* 361 F.3d 1168, 1176 (9th Cir. 2004).  Yet, the Supreme Court dismissed this "perceived anomaly" as resting on a misconception of the Court's rulings, explaining that government employees' "public statements" are protected only to the extent that they are made "outside the course of performing their official duties."  547 U.S. at 423, 126 S. Ct. at 1961.  This passage from *Garcetti* confirms this Court's view that the substance of a communication is of far greater significance than its audience in determining whether it was made pursuant to an employee's official duties.  *See Winder,* 511 F. Supp.2d at 175 (reasoning that "the content of [an employee's] complaint and the subject matter of the employee's duties, not

to whom it was submitted, will determine whether the speech is protected"). *But see Davis v. McKinney,* 518 F.3d 304, 313 (5th Cir. 2008) (opining that "[i]f . . . a public employee takes his job concerns to persons outside the work place in addition to raising them up the chain of command at his workplace, then those external communications are ordinarily not made as an employee, but as a citizen").

Nor is the result in this case altered by Plaintiff's testimony that she acted in defiance of her supervisor's instructions by speaking to a newspaper reporter. First, *Garcetti* emphasizes that a court's inquiry into an employee's job responsibilities is a "practical one," and that "the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Garcetti,* 547 U.S. at 424-25, 126 S. Ct. at 1961-62. Citing this reasoning, the courts have held that it does not matter whether the communication at issue in a particular case was the product of a specific job duty to engage in such speech — or, indeed, was in contravention of a directive ***not*** to speak — so long as it "occurred as part of carrying out [the plaintiff employee's] professional responsibilities." *Weisbarth,* 499 F.3d at 544 (internal quotation marks and citation omitted); *see also Nixon,* 511 F.3d at 498-99 (finding it "not dispositive" that the plaintiff police officer's statement to the media was "unauthorized" by his employer "and that speaking to the press was not part of his regular job duties," where the officer's "statement was made while he was performing his job"); *Williams v. Dallas Independent School District,* 480 F.3d 689, 694 (5th Cir. 2007)

(observing that "[s]imply because [the plaintiff] wrote memoranda, which were not demanded of him, does not mean he was not acting within the course of performing his job"); *Casey,* 473 F.3d at 1331 (holding that the plaintiff's report to the federal authorities was unprotected even though she "disregarded her superiors' direction to suppress her findings about the Head Start program"); *Green v. Board of County Commissioners,* 472 F.3d 794, 800-01 (10th Cir. 2007) (finding that the plaintiff's advocacy of different policies and procedures, "even if not explicitly required as part of her day-to-day job responsibilities," nonetheless "stemmed from . . . the type of activities that she was paid to do").  Likewise, in this case, Plaintiff's internal and external communications alike were a product of her day-to-day job responsibilities, and this remains true even if some of this speech was directed at an unauthorized audience.  As the very same speech made both within and outside Plaintiff's chain of command, each of Plaintiff's communications equally "owe[d] its existence to [her] professional responsibilities."  *Garcetti,* 547 U.S. at 421, 126 S. Ct. at 1960.

Finally, it does not matter that, by the time Plaintiff communicated with the media, she had ceased to perform the job task — the entry of invoices — that gave rise to her concerns about the School District's Title I expenditures.  Again, the subject matter of Plaintiff's internal and external communications was precisely the same, and she does not claim that she learned anything new in the interim or conveyed any additional concerns to the newspaper reporter that she had not raised with her supervisor and colleagues.  Rather, because both sets of communications owed their existence to Plaintiff's job

responsibilities, her later communications were not suddenly imbued with First Amendment protection once she ceased to perform these duties. *See McGee v. Public Water Supply, District #2,* 471 F.3d 918, 921 (8th Cir. 2006) (holding that the plaintiff's statements were made pursuant to his official job duties even though he had been removed from one project about which he complained and "was told not to concern himself with" another matter about which he spoke). Moreover, given *Garcetti*'s instruction that the determination of an employee's duties "is a practical one," 547 U.S. at 424, 126 S. Ct. at 1961, Plaintiff's unilateral decision to abandon one of her job functions does little to alter the nature of her speech about a duty she previously performed.

Accordingly, the Court finds as a matter of law that Plaintiff's communications to her supervisor and the media were made pursuant to her duties as a School District employee, and not as a citizen. The Court emphasizes that this ruling is narrowly limited to the facts of the present case. In particular, the Court does not hold that an employee's communications forfeit their entitlement to First Amendment protection whenever they can be said to "relate back" in some way to a prior statement that owes its existence to the employee's official duties. Here, however, there simply is no basis for distinguishing between Plaintiff's initial statements to her supervisor and her subsequent letter to the media, where each of these communications addressed precisely the same subject matter within the scope of Plaintiff's job responsibilities. Neither does the Court mean to deny the strong public interest in "[e]xposing governmental inefficiency and misconduct," *Garcetti,* 547 U.S. at 425, 126 S. Ct. at 1962, or the important role that Plaintiff's

24

communications evidently played in revealing the School District's apparent misuse of federal funds. Yet, whatever might be said "as a matter of good judgment" about how the School District should have responded to Plaintiff's concerns, *Garcetti*, 547 U.S. at 425, 126 S. Ct. at 1962, the rule that emerged from *Garcetti* defeats Plaintiff's claim to First Amendment protection for her expressions of these concerns.[7]

## IV. CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant Detroit Board of Education's October 29, 2007 motion for summary judgment is GRANTED IN PART as to Plaintiff's federal claim of First Amendment retaliation, with the Court declining to reach the remaining arguments advanced in Defendant's motion.

s/Gerald E. Rosen
Gerald E. Rosen
United States District Judge

Dated: June 12, 2008

I hereby certify that a copy of the foregoing document was served upon counsel of record on June 12, 2008, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry
Case Manager

---

[7]Having resolved Plaintiff's sole claim arising under federal law, the Court declines to address the Defendant School District's various challenges to Plaintiff's state-law claims, and instead elects not to exercise supplemental jurisdiction over these remaining claims. See 28 U.S.C. § 1367(c)(3). Indeed, this decision to relinquish supplemental jurisdiction is particularly appropriate here, where Plaintiff's state-law claims rest upon a somewhat different set of facts and are governed by entirely distinct legal standards.